[Cite as *State v. Jackson*, 2015-Ohio-3520.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| --- | --- | --- |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | C.A. No.     14CA010593 |
| --- | --- |
|     Appellant | |
|     v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| TYRONE JACKSON | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
|     Appellee | CASE No.     11CR082249 |

DECISION AND JOURNAL ENTRY

Dated: August 31, 2015

---

MOORE, Judge.

{¶1}    Appellant, the State of Ohio, appeals from the judgment of the Lorain County Court of Common Pleas, granting Appellee, Tyrone Jackson's, motion to suppress. This Court affirms.

I.

{¶2}    After receiving a tip from an informant, members of the Cuyahoga County Sheriff Department's Narcotics Unit began investigating Tara Bell. Ms. Bell's activities ultimately led the police to secure a warrant for the search of her home. The fruits of the search led to a discussion between Ms. Bell and members of the Narcotics Unit. According to the State, Ms. Bell agreed to become a confidential informant and to aid the Narcotics Unit in investigating her associate, Mr. Jackson. Ms. Bell informed the police that she and Mr. Jackson had each purchased a large amount of drugs from different suppliers in Detroit. She also told them that Mr. Jackson had agreed to hold onto the heroin she had purchased there until she contacted him.

**{¶3}** On the same day that the police searched her home, Ms. Bell called Mr. Jackson and arranged to meet him at his house to pick up her heroin. Members of the Narcotics Unit outfitted her with a wire in preparation for her meeting with Mr. Jackson. Ms. Bell then drove to Mr. Jackson's home on Bellfield Avenue, parked outside, and waited in her car. One member of the Narcotics Unit watched as Mr. Jackson came out of his house with a bag and handed the bag to Ms. Bell through the window of her car. The contents of the bag later tested positive for heroin.

**{¶4}** Believing that Mr. Jackson had more controlled substances in his possession, the Narcotics Unit sought a warrant for the search of his home. Detective Vito Monteleone served as the affiant for the warrant. In his affidavit, Detective Monteleone averred that a confidential informant (Ms. Bell) had informed the Narcotics Unit that Mr. Jackson sold narcotics out of his home on Bellfield Avenue. He further averred that the confidential informant had agreed to "purchase heroin and pills from [Mr.] Jackson," so the Narcotics Unit had arranged for a "controlled purchase." According to Detective Monteleone's affidavit, the confidential informant "ordered a quantity of heroin from [Mr.] Jackson" on the phone before driving to his home. Detective Monteleone averred that the confidential informant received a bag from Mr. Jackson before Mr. Jackson reentered his home. He further averred that the confidential informant then "handed over a quantity of suspected heroin and pills" to the Narcotics Unit and field testing confirmed the presence of heroin.

**{¶5}** A judge issued a search warrant for Mr. Jackson's home on the basis of the averments contained in Detective Monteleone's affidavit. The Narcotics Unit then searched Mr. Jackson's house and discovered a variety of contraband, including narcotics and several guns. A

grand jury indicted Mr. Jackson on two counts of drug trafficking, four counts of possession, one count of drug paraphernalia, and one count of having weapons under disability.

{¶6} Mr. Jackson filed a motion to suppress on several grounds. Relevant to this appeal, he challenged the warrant for the search of his home on the basis that Detective Monteleone's affidavit contained either deliberate falsehoods or statements made with reckless disregard for their truth. Mr. Jackson later learned of Ms. Bell's identity as the confidential informant referenced in the affidavit and supplemented his motion to suppress with an affidavit from Ms. Bell. In her affidavit, Ms. Bell averred that she never agreed to cooperate with the police or to participate in a "controlled purchase/pick-up" from Mr. Jackson. She further averred that she never "provided statements regarding [Mr.] Jackson to law enforcement." The State responded in opposition to Mr. Jackson's motion, and the court held a hearing on the matter.

{¶7} The trial court found that Detective Monteleone's affidavit contained either deliberate falsehoods or statements made with reckless disregard for the truth. The court further determined that, once it removed the offending statements from the affidavit, the affidavit did not contain sufficient information to warrant a finding of probable cause and to justify the issuance of a warrant for a search of Mr. Jackson's home on Bellfield Avenue. Consequently, the court granted Mr. Jackson's motion to suppress.

{¶8} The State now appeals from the trial court's judgment and raises four assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT ERRED IN PROCEEDING TO A HEARING ON [MR.] JACKSON'S MOTION TO SUPPRESS BASED UPON A VIOLATION PURSUANT TO FRANKS V. DELAWARE.

{¶9} In its first assignment of error, the State argues that the court erred when it determined that Mr. Jackson was entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, it argues that Mr. Jackson failed to make a substantial preliminary showing that Detective Monteleone's affidavit contained statements that were either deliberately false or made with reckless disregard for the truth. We do not agree that the court erred when it found that Mr. Jackson satisfied his *Franks* burden.

{¶10} "There is * * * a presumption of validity with respect to the affidavit supporting [a] search warrant." *Franks*, 438 U.S. at 171. "In *Franks v. Delaware* * * *, the United States Supreme Court squarely addressed the issue of when a defendant, under the Fourth Amendment, is entitled to a hearing to challenge the veracity of the facts set forth in the warrant affidavit after the warrant has been issued and executed." *State v. Roberts*, 62 Ohio St.2d 170, 177 (1980).

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Franks* at 171. Moreover, "[e]ven if a defendant makes a sufficient preliminary showing, a hearing is not required unless, without the allegedly false statements, the affidavit is unable to support a finding of probable cause." *State v. Cubic*, 9th Dist. Medina No. 09CA0005-M, 2009-Ohio-5051, ¶ 11, citing *Roberts* at 178, quoting *Franks* at 171-172.

{¶11} Mr. Jackson specifically asserted that Detective Monteleone's affidavit contained statements that were either deliberately false or made with reckless disregard for the truth. In support of his argument, Mr. Jackson presented the court with an affidavit from Ms. Bell, the

confidential informant that Detective Monteleone referenced throughout his affidavit. In her affidavit, Ms. Bell included the following averments:

> 9. At no time in 2010 through the present have I ever agreed to cooperate with law enforcement, nor have I provided statements regarding [Mr.] Jackson to law enforcement.

> 10. I never agreed to participate in a "controlled purchase/pick-up" from [Mr.] Jackson, nor any other individual on or about January 2010.

Mr. Jackson argued that Ms. Bell's affidavit drew into question whether she, in fact, acted as a confidential informant and provided the police with information about him. Consequently, he argued that he satisfied the preliminary showing required by *Franks* in order to obtain a hearing.

{¶12} The State argues that Mr. Jackson was not entitled to a *Franks* hearing because he did not specifically point out the allegedly false portions of Detective Monteleone's affidavit. The trial court correctly determined, however, that Mr. Jackson satisfied his *Franks* burden.

{¶13} Mr. Jackson supported his motion with the affidavit of Ms. Bell and his allegations went beyond mere negligence or innocent mistake. *See Franks* at 171. In her affidavit, Ms. Bell specifically averred that she never provided the police with any statements about Mr. Jackson and never agreed to participate in a "controlled purchase/pick-up." It is indisputable that Detective Monteleone's affidavit rested heavily upon the intelligence his department allegedly received from Ms. Bell and her participation in their investigation of Mr. Jackson. Accordingly, her averments that she did not provide the police with any intelligence or agree to aid them in their investigation of Mr. Jackson drew a significant portion of his affidavit into question. Although Mr. Jackson did not initially identify the allegedly false portions of

Detective Monteleone's affidavit by paragraph number,[1] his allegations were far from conclusory. We agree with the trial court's conclusion that Mr. Jackson's allegations and evidence brought into question Ms. Bell's "actions and conduct with [Mr. Jackson] and with the police agencies * * *." The statements in her affidavit directly conflicted with the statements in Detective Monteleone's affidavit, such that only one set of statements could be true. Accordingly, the court did not err by finding that Mr. Jackson made a sufficient preliminary showing under *Franks*. *See Roberts*, 62 Ohio St.2d at 177, quoting *Franks* at 155-156.

{¶14} Notably, "[e]ven if a defendant makes a sufficient preliminary showing [under *Franks*], a hearing is not required unless, without the allegedly false statements, the affidavit is unable to support a finding of probable cause." *Cubic*, 2009-Ohio-5051, at ¶ 11, citing *Roberts* at 178, quoting *Franks* at 171-172. The State has not argued, however, that a hearing was unnecessary because Detective Monteleone's affidavit would still have provided the magistrate with probable cause in the absence of the intelligence the police allegedly gathered from Ms. Bell. Accordingly, we need not address that issue on appeal. *See Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998) ("If an argument exists that can support this assignment of error, it is not this [C]ourt's duty to root it out."). Because the trial court did not err by concluding that Mr. Jackson made a sufficient preliminary showing under *Franks*, the State's first assignment of error is overruled.

**ASSIGNMENT OF ERROR III**

THE TRIAL COURT ERRED IN DETERMINING THE SEARCH WARRANT AFFIDAVIT DID NOT CONTAIN SUFFICIENT PROBABLE CAUSE FOR THE ISSUANCE OF THE SEARCH WARRANT BASED UPON

---

[1] As discussed in the State's third assignment of error, Mr. Jackson later specified that Ms. Bell's affidavit specifically drew into question paragraphs three through seven of Detective Monteleone's affidavit.

ALLEGATIONS [MR.] JACKSON DID NOT ALLEGE IN HIS MOTION TO SUPPRESS.

{¶15} In its third assignment of error, the State argues that the trial court erred when it granted Mr. Jackson's motion to suppress on the basis of issues he failed to raise himself. Specifically, it argues that the *Franks* hearing and the court's resulting decision should have been limited to the sole issue Mr. Jackson raised, i.e., whether Ms. Bell cooperated with the Sheriff's Department.

{¶16} As previously noted, in claiming that a search warrant affidavit contains deliberate falsehoods or statements made with reckless disregard for their truth, a defendant "should point out specifically the portion of the warrant affidavit that is claimed to be false * * *." *Franks*, 438 U.S. at 171. Likewise, "to support a motion to suppress, a defendant must 'state the motion's legal and factual bases with sufficient particularity to place the prosecutor and the court on notice of the issues to be decided.'" *State v. Walters*, 9th Dist. Medina No. 11CA0039-M, 2012-Ohio-2429, ¶ 4, quoting *State v. Shindler*, 70 Ohio St.3d 54 (1994), syllabus. "By requiring the defendant to state with particularity the legal and factual issues to be resolved, the prosecutor and court are placed on notice of those issues to be heard and decided by the court and, by omission, those issues which are otherwise being waived." *Shindler* at 58.

{¶17} The State argues that Mr. Jackson's motion to suppress only raised the issue of whether Ms. Bell cooperated with the Sheriff's Department. It argues that his motion failed to raise any additional issues, including the issue of whether Mr. Jackson sold heroin to Ms. Bell or whether she purchased it from another source. Accordingly, it argues that the *Franks* hearing and the court's resulting decision should have been limited strictly to the issue of whether Ms. Bell cooperated with the Sheriff's Department.

{¶18} Because Mr. Jackson raised the issue of Ms. Bell's cooperation with the Sheriff's Department, the extent and details of her cooperation were arguably matters that fell within the scope of that issue. The trial court recognized as much at the start of the *Franks* hearing. It indicated that, while it did not view Mr. Jackson's motion "as necessarily a broad motion to suppress," Ms. Bell's affidavit had "raised *any issues with regard to her actions and conduct with [Mr. Jackson] and with the police agencies * * *.*" (Emphasis added.) Thus, the scope of the hearing was not confined to the simple matter of whether Ms. Bell had, in fact, agreed to help the police. The details of her interactions with Mr. Jackson and the police fell within the scope of the hearing, as defined by the trial court.

{¶19} Further, even if Mr. Jackson's initial motion to suppress should have resulted in a more limited hearing, this Court has recognized that a trial court has the "discretion to allow a defendant to orally supplement his written motion during the suppression hearing." *State v. Smith*, 9th Dist. Summit No. 21069, 2003-Ohio-1306, ¶ 13. At the beginning of the *Franks* hearing, Mr. Jackson specifically argued that paragraphs three through seven of Detective Monteleone's affidavit were deliberately false or misleading. Those paragraphs contained averments that Ms. Bell had agreed to purchase heroin and pills from Mr. Jackson, had ordered a quantity of heroin from him, and had participated in a controlled purchase of heroin from him. Mr. Jackson argued that the foregoing averments were deliberately false or misleading because Ms. Bell never purchased heroin from him. Instead, she purchased heroin from a source in Detroit and Mr. Jackson simply agreed to hold onto her heroin until she arranged a time to pick it up. Over the State's objection, the trial court indicated that it would consider Mr. Jackson's challenge to paragraphs three through seven of Detective Monteleone's affidavit. Specifically, it indicated that Mr. Jackson had raised "any issues with regard to the involvement of Ms. Bell"

and that the State should be prepared to "address their officer's dealings with Ms. Bell." The State did not request a continuance, and the hearing went forward as scheduled. The averments Detective Monteleone made in paragraphs three through seven of his affidavit, when viewed in light of the evidence introduced at the *Franks* hearing, ultimately led the court to grant Mr. Jackson's motion to suppress.

{¶20} The record does not support the State's assertion that the trial court granted Mr. Jackson's motion to suppress on the basis of issues he failed to raise. Even assuming that Mr. Jackson's initial motion to suppress, as supplemented by Ms. Bell's affidavit, did not encompass a challenge to the averments in paragraphs three through seven of Detective Monteleone's affidavit, he specifically challenged those averments at the beginning of the *Franks* hearing. The court agreed to consider his arguments over the State's objection, and the State has not argued that the court erred by doing so. *See* App.R. 16(A)(7). The State's argument that the court granted Mr. Jackson's motion on the basis of issues he failed to raise lacks merit. Consequently, its third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED IN FINDING THAT THE SEARCH WARRANT AFFIDAVIT CONTAINED EITHER A DELIBERATE FALSEHOOD OR A RECKLESS DISREGARD FOR THE TRUTH.

{¶21} In its second assignment of error, the State argues that the trial court erred when it determined that Detective Monteleone's affidavit contained statements that were either deliberately false or made with reckless disregard for the truth. We disagree.

{¶22} "To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either 'intentionally, or with reckless disregard for the truth.'" *State v. Waddy*, 63

Ohio St.3d 424, 441 (1992), quoting *Franks*, 438 U.S. at 155-156. "'Reckless disregard' means that the affiant had serious doubts about the truth of an allegation." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 31, quoting *United States v. Williams*, 737 F.2d 594, 602 (7th Cir.1984). "Omissions count as a false statement if 'designed to mislead, or * * * made in reckless disregard of whether they would mislead, the magistrate.'" (Alterations sic.) *McKnight* at ¶ 31, quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir.1990).

{¶23} Detective Michael Engelhart testified that he interviewed Ms. Bell after the Narcotics Unit executed a warrant at her residence. During their conversation, Ms. Bell informed him that an individual was holding a specific amount of heroin for her. Ms. Bell identified Mr. Jackson as that individual and stated that she and Mr. Jackson had just returned from Detroit, where they each met with their own drug source. Ms. Bell stated that she purchased a specific amount of heroin and Mr. Jackson purchased cocaine. After the two drove back to Ohio together, Mr. Jackson agreed to hold onto Ms. Bell's heroin for her. According to Detective Engelhart, Ms. Bell agreed to collect her heroin from Mr. Jackson while wearing a wire. He confirmed that Ms. Bell never said Mr. Jackson would sell heroin to her. Detective Engelhart left for the day after speaking with Ms. Bell, but testified that he relayed the information he learned from her to his colleagues, including Detective Monteleone.

{¶24} Detective Tamika Agnew testified that she dealt with Ms. Bell after Ms. Bell agreed to act as a confidential informant. Detective Agnew outfitted Ms. Bell with a wire, which was linked to a recording device. Detective Agnew confirmed that three voices appeared on the recording made from the wire: hers, Ms. Bell's, and Detective Monteleone's. The recording was played for the trial court at the *Franks* hearing. At the beginning of the recording, Detective Monteleone summarized Ms. Bell's involvement by stating that she had purchased drugs from

Mr. Jackson and had agreed to pick up the drugs while under surveillance. Detective Agnew then corrected Detective Monteleone by stating that Ms. Bell had not purchased drugs from Mr. Jackson. Rather, Ms. Bell had purchased the drugs herself and was picking them up from Mr. Jackson. After Ms. Bell confirmed that Detective Agnew was correct, Detective Monteleone noted the correction on the recording.

{¶25} Detective Monteleone testified that he received information about Ms. Bell from his fellow detectives. According to Detective Monteleone, he was told that Ms. Bell and Mr. Jackson had gone to Detroit to purchase drugs and that Mr. Jackson was holding onto the drugs that Ms. Bell had purchased. He testified that he aided in a "controlled purchase" wherein Ms. Bell retrieved her drugs from Mr. Jackson while wearing a wire. Two days after Ms. Bell retrieved her drugs from Mr. Jackson, Detective Monteleone completed an affidavit for a warrant to search Mr. Jackson's home. According to Detective Monteleone, his affidavit referred to the exchange between Ms. Bell and Mr. Jackson as a "controlled purchase" rather than a pick up or delivery because "it's just a pretty basic, * * * kind of a standard way of how I write my reports." He testified that he did not intend to include false information in his affidavit and that he completed it to the best of his memory. He admitted, however, that he drafted the affidavit without listening to the recording made from Ms. Bell's wire.

{¶26} Paragraphs three through seven of Detective Monteleone's affidavit provide as follows:

> 3. Affiant states CI indicated that CI could purchase heroin and pills from [Mr.] Jackson. Affiant states that through a controlled purchase was planned with the assistance of CI. [(Sic.)]

> 4. Affiant states that the buy occurred within the past seventy-two hours. Affiant met with the CI. The CI and the CI's vehicle were both searched for money, drugs, and other contraband yielding negative results.

5. Affiant avers that a telephone call between CI and [Mr.] Jackson was recorded. Affiant states that CI ordered a quantity of heroin from [Mr.] Jackson. Affiant avers that CI entered CI's vehicle and drove, under constant surveillance while making no stops, to [Mr. Jackson's residence] where the CI meet [(sic)] to purchase the heroin.

6. Affiant avers that the following was observed: CI arrived at the location and met with a male matching the physical description of [Mr.] Jackson; that the male handed over to CI what appeared to be a bag. After the exchange, CI proceeded immediately to the location to meet up with law enforcement officers. Affiant states that the male target was observed to re-enter the premises.

7. Affiant avers that CI handed over a quantity of suspected heroin and pills. Affiant states that CI was under constant visual surveillance and made no stops before meeting affiant. CI informed affiant that the suspected narcotics were obtained from the target, which CI identified as [Mr.] Jackson.

The affidavit did not include any information about Mr. Jackson and Ms. Bell travelling to Detroit together to purchase drugs.

{¶27} The State argues that the trial court erred by granting Mr. Jackson's motion to suppress because the evidence introduced at the *Franks* hearing refuted the claims Ms. Bell made in her affidavit. Specifically, the evidence showed that she did, in fact, cooperate with the Narcotics Unit, give them information about Mr. Jackson, and participate in a "controlled purchase/pick-up" from Mr. Jackson. As previously explained, however, Mr. Jackson's challenge to the veracity of Detective Monteleone's affidavit specifically included a challenge to the averments contained in paragraphs three through seven of the affidavit. The question, therefore, is whether the trial court erred by concluding that the averments contained in those paragraphs were either deliberately false or made with reckless disregard for their truth. We conclude that it did not.

{¶28} In his affidavit, Detective Monteleone specifically averred that: (1) Ms. Bell said she could *purchase* drugs from Mr. Jackson; (2) *pills* were one of the items she could purchase; (3) Ms. Bell called Mr. Jackson and *ordered* heroin from him; (4) Ms. Bell participated in a

*controlled purchase/buy* from Mr. Jackson at his home; and (5) the controlled purchase/buy resulted in Ms. Bell receiving a quantity of suspected heroin *and pills*. There was no evidence, however, that any of those averments was true. Multiple officers testified that Ms. Bell purchased heroin in Detroit and only agreed to pick up her heroin from Mr. Jackson. There was no evidence that she ordered heroin from Mr. Jackson or purchased heroin from him. Moreover, there was no evidence that she purchased or received pills from Mr. Jackson. Although Detective Monteleone claimed to have referred to the exchange between Ms. Bell and Mr. Jackson as a "controlled purchase" simply because that was the "standard way" he wrote his reports, one could only conclude from reading paragraphs three through seven of his affidavit that Mr. Jackson had sold drugs to Ms. Bell. In actuality, Mr. Jackson had not done so.

{¶29} In the recording taken from Ms. Bell's wire, Detective Agnew corrected Detective Monteleone when he stated that Ms. Bell had purchased drugs from Mr. Jackson. Ms. Bell confirmed that she did not purchase drugs from Mr. Jackson, and Detective Monteleone acknowledged the correction. Yet, the affidavit he completed two days later portrayed the exchange between Ms. Bell and Mr. Jackson as a sale of drugs. Even assuming that he did not intentionally include falsehoods in his affidavit, the trial court did not err by concluding that he made the averments outlined above with reckless disregard for their truth. *See Waddy*, 63 Ohio St.3d at 441, quoting *Franks*, 438 U.S. at 155-156. *See also McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, at ¶ 31, quoting *Williams*, 737 F.2d at 602. Those averments contravened the testimony of multiple officers, as well as the recording that Detective Monteleone failed to review before drafting his affidavit. Consequently, the court correctly determined that Mr. Jackson satisfied his burden of proof. The State's second assignment of error is overruled.

**ASSIGNMENT OF ERROR IV**

THE TRIAL COURT ERRED IN FINDING THAT THERE WAS NOT SUFFICIENT PROBABLE CAUSE TO SUPPORT THE ISSUANCE OF THE SEARCH WARRANT AFTER EXCISING FALSE INFORMATION FROM THE AFFIDAVIT.

{¶30} In its fourth assignment of error, the State argues that the trial court erred when it found that, without the false statements contained therein, Detective Monteleone's affidavit did not provide probable cause for the issuance of a search warrant. We disagree.

{¶31} If a defendant satisfies his burden at a *Franks* hearing and,

> with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*State v. Dibble*, 133 Ohio St.3d 451, 2012-Ohio-4630, ¶ 17, quoting *Franks*, 438 U.S. at 155-156. *Accord Waddy*, 63 Ohio St.3d at 441. "'[P]robable cause is the existence of circumstances that warrant suspicion.'" *State v. Russell*, 9th Dist. Summit No. 26819, 2013-Ohio-4895, ¶ 8, quoting *State v. Tejada*, 9th Dist. Summit No. 20947, 2002-Ohio-5777, ¶ 8. When considering whether to issue a search warrant, a judge or magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotations omitted.) *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

{¶32} The question here is whether, once the offending portions of Detective Monteleone's affidavit were removed, the affidavit "provided a substantial basis for the judge to conclude that there was 'a fair probability that contraband or evidence of a crime [would] be found [inside Mr. Jackson's home on Bellfield Avenue].'" *State v. Stull*, 9th Dist. Summit No.

27036, 2014-Ohio-1336, ¶ 14, quoting *State v. George*, 45 Ohio St.3d 325 (1989), paragraph one of the syllabus, quoting *Gates*, 462 U.S. at 238-239. The offending portions of his affidavit included the statements that Ms. Bell could purchase heroin and pills from Mr. Jackson, that Ms. Bell ordered a quantity of heroin from Mr. Jackson, that a controlled purchase/buy occurred outside of Mr. Jackson's residence, and that the package Mr. Jackson gave Ms. Bell included pills. Without those statements, the exchange between Mr. Jackson and Ms. Bell was reduced to Mr. Jackson handing Ms. Bell a bag containing heroin. There were no other facts in the affidavit to support the conclusion that Mr. Jackson had more drugs or other contraband inside his home. Accordingly, the remainder of the affidavit did not "provide[] a substantial basis for the judge to conclude that there was 'a fair probability that contraband or evidence of a crime [would] be found [inside Mr. Jackson's home].'" *Stull* at ¶ 14, quoting *George* at paragraph one of the syllabus, quoting *Gates* at 238-239. The trial court did not err by granting Mr. Jackson's motion and voiding the search warrant. *See Dibble* at ¶ 17, quoting *Franks* at 155-156. Consequently, the State's fourth assignment of error is overruled.

### III.

{¶33} The State's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT

WHITMORE, P. J.
CONCURS.

SCHAFER, J.
DISSENTING.

{¶34} In my view, the trial court erred by expanding the scope of the *Franks* hearing beyond the issues presented by Jackson and incorrectly found that the search warrant affidavit included misstatements that were made either deliberately or with reckless disregard for their truth. Since the majority has concluded to the contrary on these points, I must respectfully dissent.

A. Scope of the *Franks* Hearing

**{¶35}** Affidavits in support of search warrants are given a "presumption of validity," *Franks v. Delaware*, 438 U.S. 154, 171 (1978), which "is not easily overcome," *State v. Jordan*, 1st Dist. Hamilton No. C-060336, 2007-Ohio-3449, ¶ 9. As a result, to properly raise any issues relating to purported misstatements in a search warrant affidavit, the defendant must provide "allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Franks* at 171. It is particularly relevant to this matter that the defendant must "point out *specifically* the portion of the warrant affidavit that is claimed to be false[.]" (Emphasis added.) *Id.*; *see also State v. Roberts*, 62 Ohio St.2d 170, 178 (1980) (adopting *Franks*). This particularity requirement for a *Franks* allegation is compounded when a defendant asserts it via a motion to suppress, which must "state the motion's legal and factual bases with sufficient particularity to place the prosecutor and the court on notice of the issues to be decided." *State v. Shindler*, 70 Ohio St.3d 54 (1994), syllabus; *see also City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218 ("The prosecutor must know the grounds of the challenge in order to prepare his case, and the court must know the challenge in order to rule on evidentiary issues at the hearing and properly dispose of the merits.").

**{¶36}** Jackson's motion to suppress asserted merely one basis for a *Franks* violation – that Ms. Bell was never involved in a police investigation of his illicit drug activities. In support, he provided Ms. Bell's affidavit which claimed the same. But, the record clearly contradicts the suggestion that Ms. Bell was not involved in the police investigation of Jackson. Indeed, it shows that she was intricately involved by way of not only providing information during interrogation sessions but also acting as a confidential informant who wore a recording device

during a controlled delivery of heroin.[2]  Once the State provided testimony and the recording of the drug delivery that included Ms. Bell's and Jackson's voices, the only basis for the asserted *Franks* violation was entirely discredited.  That should have been the end of the inquiry for the trial court and it should have then determined that there was no *Franks* violation.  *See United States v. Thoms*, No. 3:10-cr-069-JWS-JDR, 2011 WL 87337 (D.Alaska Jan. 11, 2011) (rejecting two of the defendant's three bases for a *Franks* hearing and stating that "[a] limited hearing on [the non-rejected basis] is set").

**{¶37}**  The mere fact that a *Franks* hearing is justified does not provide trial courts with unfettered discretion to conduct a plenary review of a search warrant affidavit.  To declare that such plenary review is appropriate would completely subvert the particularity requirement for motions to suppress on the basis of a *Franks* violation.  Here, Jackson had to give a particular basis for a *Franks* violation.  After originally satisfying this burden by filing Ms. Bell's affidavit, the trial court conducted a hearing in which the evidence directly contradicted and discredited that affidavit, which should have produced a finding of no *Franks* violation.

**{¶38}**  Because of the limited basis asserted in the motion to suppress, I would not read a dramatic expansion into Jackson's arguments.  Indeed, the trial court itself described the *Franks* hearing as covering narrow issues:

> Your final issue is one with regard to the scope of this hearing.  In my mind, the scope of a Franks hearing is determined by what evidence is disputed in the underlying affidavit, in the sense that if Ms. Bell had said, I never went over to the house on January whatever of 2010, then the State would have had to present factual evidence with regard to that issue.  I don't know that she's done that in regard, and so I don't see this as necessarily a broad motion to suppress, but certainly Ms. Bell, I think, has raised any issues – her affidavit has raised any

---

[2] Unfortunately, the record does not include any explanation for why Ms. Bell's statements in the affidavit are so clearly divergent from the facts of the police investigation into this matter.  She was called to testify at the suppression hearing, but asserted her Fifth Amendment privilege.  Indeed, she refused to even acknowledge signing the affidavit purportedly prepared by her.

issues with regard to her actions and conduct with the Defendant and with the police agencies; and so that's what I believe to be the scope of this motion to suppress.

**{¶39}** Jackson did not object to this description of the hearing's scope. The trial court should have stuck to its description of the hearing's scope – it was to only cover the issue raised in Ms. Bell's affidavit, her purported lack of involvement with the police investigation. In light of the trial court's description, the State was not on notice of any issues in the *Franks* hearing beside Ms. Bell's disputed involvement and the trial court improperly extended the scope of the hearing beyond what it originally described. I therefore would sustain the State's third assignment of error.

### B. The Truth of the Statements in the Search Warrant Affidavit

**{¶40}** This resolution of the third assignment of error would necessitate reversal of the trial court's judgment and render the remaining assignments of error moot. Nevertheless, it is necessary to express my disagreement with the lead opinion's resolution of the second assignment of error.

**{¶41}** Even if the scope of the *Franks* hearing encompassed issues unraised in Ms. Bell's affidavit, the trial court still erroneously determined that the inaccuracies in paragraphs three through seven of the search warrant affidavit were made either deliberately or with reckless disregard for their truth. The record reflects and Sergeant Monteleone admits that he made clerical mistakes and engaged in inartful drafting when he prepared the search warrant affidavit. Under well-settled law, such minor mistakes, made within the context of a police investigation, cannot give rise to a finding of bad faith on Sergeant Monteleone's part.

**{¶42}** We recently cautioned against placing "too onerous a burden on police officers that does not comport with the current state of Fourth Amendment jurisprudence or the practical

considerations inherent in assessments of police conduct's constitutionality." *State v. Myers*, 9th Dist. Summit No. 27576, 2015-Ohio-2135, ¶ 15, citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965); *Spinelli v. United States*, 393 U.S. 410, 438-439 (1969) (Fortas, J., dissenting). This caution is perfectly in line with the Ohio Supreme Court's guidance that "[a] determination whether information in a search-warrant affidavit is false must take into account the nontechnical language used by lawyers." *State v. Dibble*, 133 Ohio St.3d 451, 2012-Ohio-4630, ¶ 24. Further, the cautioned approach announced in *Myers* follows the instruction given by the United States Supreme Court:

> If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants * * * must be tested and interpreted by [judges] and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts towards warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*Ventresca* at 108.

{¶43} Accordingly, we must consider the context within which Sergeant Monteleone prepared the search warrant affidavit on January 21, 2010. This was six days after one controlled purchase put Sergeant Monteleone and his team on notice that Ms. Bell was involved in the trade of heroin. On January 19, 2010, the police executed a search warrant for Ms. Bell's residence, which produced the discovery of drugs and led to extensive interrogation of Ms. Bell. During that interrogation, she indicated that Jackson was also involved in the drug trade and was holding heroin that belonged to her at his house. Shortly after this revelation and Ms. Bell's agreement to act as a confidential informant, Sergeant Monteleone's team mobilized to set up surveillance around Jackson's residence so that a controlled delivery of the heroin could occur that day. During this time, some of Sergeant Monteleone's team worked 72 hours straight. After Ms.

Bell's controlled delivery with Jackson, the police officers did not sit on the information until it became stale; they produced an affidavit within two days.

**{¶44}** When we are addressing a case like this one, we must refrain from "lament[ing] the lack of more specific information in the affidavit," *Myers*, 2015-Ohio-2135, at ¶ 17, and trial courts should abstain from second-guessing reasonable actions taken by police during an investigation. Instead of engaging in hypertechnical analysis, we must review the affidavit and the information giving rise to it for the reasonableness of the police's action. *See State v. Carlson*, 102 Ohio App.3d 585, 592 (9th Dist.1995) ("The primary purpose of the Fourth Amendment is to impose a standard of reasonableness upon the exercise of discretion by law enforcement officers[.]"). Once we adopt this disposition towards the facts in this case, it becomes apparent that the record does not support the trial court's finding that the warrant affidavit contains deliberate misstatements or those made with reckless disregard for their truth.

**{¶45}** Jackson's main point of contention in Sergeant Monteleone's averments is his statement that there was a "controlled purchase" in front of Jackson's residence. Jackson correctly points out that the heroin was actually purchased by Ms. Bell and Jackson in Detroit earlier on January 19, 2010 and that there was no exchange of money when Ms. Bell went to his house to retrieve the heroin. As a result, "controlled purchase" was not the best descriptor for the interaction between Ms. Bell and Jackson and it was inaccurate for Sergeant Monteleone to use that term.

**{¶46}** But, the record reflects that Sergeant Monteleone's use of this term was not made in bad faith and was, at worst, careless. He twice used the term "controlled purchase" in his testimony in reference to the interaction between Ms. Bell and Jackson and he also called it a

"transaction." More importantly, he explicitly testified as follows regarding the drafting of the affidavit itself:

> Q: And the information within that document, was it sworn in front of a Judge?
>
> A: Yes.
>
> Q: And was it done to the best of your memory?
>
> A: Yes.
>
> Q: The best of your recollection?
>
> A: Yes.
>
> Q: Okay. And any of the information in there, let's just say hypothetically speaking there's an error in there. * * * My question to you, did you have any purposeful malicious intent in putting any false information in that document?
>
> A: No.
>
> Q: Okay. * * * Back when this was requested, this search warrant, did you have any ax to grind, you know, any problems with a person named Tyrone Jackson, any vendetta against him?
>
> A: No. I don't know Tyrone Jackson. I have no reason to hold any kind of a grudge against the man.

As to his use of the term "controlled purchase" in the affidavit, Sergeant Monteleone testified as follows:

> Q: [After restating paragraph three of the affidavit] My question really to you is the term "controlled purchase." We've heard about how this all went down, how it is that Tara Bell came into contact with some drugs, how Tyrone Jackson may have come into contact with drugs. Why are we referring to this as a purchase, instead of maybe a delivery, a drop-off? * * *
>
> A: Well it's just a pretty basic, you know, kind of a standard way of how I write my reports. * * * I want to say it's pretty standard with most of our team as well.
>
> Q: Okay. Whether you put purchase, pickup, delivery, in your mind, is that a problem? Is that misinformation?

A:    No.

**{¶47}** Detective Monteleone even stood strong in his use of the term when cross-examined by Jackson's counsel.  He did not retreat from the use of the word "buy" to describe the interaction between Jackson and Ms. Bell:

Q:    Regarding your sworn statement, your affidavit, we've talked about Averment No. 3, but then Averment No. 4 says, "Affiant states that the buy occurred within the past 72 hours."  Now we know that that's not true, either.  So was that in error?

* *

A:    That the buy?  Well, in my opinion, that is a buy.

Sergeant Monteleone's continued use of "buy" was followed by this relevant exchange:

Q:    And things like controlled buys, and purchases, and what not, are language in your training and experience associated with narcotics trafficking, right?

A:    Yes.

Q:    And you certainly know in your training and experience someone is more likely to give you a search warrant when they feel that you have conducted buys, purchases, things of that nature, correct?

A:    If you're insinuating that I used that specific language in order to get the search warrant, the answer is no.

Q:    It was just an error.

A:    It's just a standard language that I've used.  This was a unique situation.  To be honest with you, I believe it's the only situation where we retrieved a quantity of drugs that weren't actually purchased.

**{¶48}** Sergeant Monteleone's testimony reveals five critical items in determining whether he deliberately made misstatements in his affidavit for the search warrant.  First, he considers the terms "controlled purchase,"  "controlled delivery," and "controlled drop-off" to be

synonymous.[3] Second, he has no ill will towards Jackson that would color his judgment and he does not use certain language simply to obtain a warrant. Third, he prepared the affidavit to the best of his recollection based on his understanding of the facts of the case. Fourth, "controlled purchase" was standardized language for Sergeant Monteleone's affidavit. And, fifth, the circumstances of Ms. Bell's meeting with Jackson were very unusual and unlike any other case Sergeant Monteleone had previously handled.

{¶49} Based on these facts disclosed during Sergeant Monteleone's testimony, I find that there was an insufficient basis for concluding that he deliberately lied in his affidavit or made statements with reckless disregard for their truth. Rather, the circumstances of this case can produce only one conclusion – that any errors in the affidavit were clerical mistakes or the result of carelessness, neither of which gives rise to a *Franks* violation. *See United States v. Young Buffalo*, 591 F.2d 506, 510 (9th Cir.1979) (" '[A]llegations of negligence or innocent mistake are insufficient' to meet the first leg of the test[.]"), quoting *Franks*, 438 U.S. at 171; *State v. Batain*, 8th Dist. Cuyahoga No. 91502, 2009-Ohio-2582, ¶ 28 (finding that error in search warrant affidavit was not made intentionally or with reckless disregard for the truth where the officer "testified that he made a typing error, and nothing in the record shows otherwise"); *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, ¶ 13-15 (1st Dist.) (finding that "clerical error" in search warrant affidavit made from "template with 'boilerplate language'" was not made intentionally or with reckless disregard for the truth).

{¶50} My conclusion on this point is bolstered by the Ohio Supreme Court's decision in *Dibble*. The controversy there, like the one in this matter, was over the detective's use of one

---

[3] I believe that it is critical to note that Sergeant Monteleone's affidavit does not include an averment that there was an exchange of money between Jackson and Bell or that the police gave her money to complete the transaction. Indeed, the affiant explicitly states that before the controlled purchase/delivery, Ms. Bell was searched for money and she had none on her.

word in the affidavit. Specifically, the defendant objected to the detective's purportedly inaccurate use of the term "victim" to describe a woman who was previously a student of the defendant and who engaged in sexual activity with the defendant after she turned 18 years old. *Dibble*, 133 Ohio St.3d 451, at ¶ 6. The proceedings in the trial court reflected that the detective testified he did not use the word "victim" just to obtain a search warrant, *State v. Dibble*, 195 Ohio App.3d 189, 2011-Ohio-3817, ¶ 6 (10th Dist.), and that he still considered the woman described in the warrant affidavit to be a victim at the time of his testimony, *id.* at ¶ 12. Nevertheless, the trial court said that the use of this term "amounted to knowingly and intentionally including false information" in the affidavit and the court of appeals affirmed because that finding was supported in the record. *Dibble*, 133 Ohio St.3d 451, at ¶ 20. The Supreme Court, however, reversed, described the lower courts' reasoning as a "hypertechnical analysis," and concluded "the trial court used too narrow a definition of 'victim' by viewing the term to encompass only victims of crime." *Id.*

{¶51} *Dibble* is strikingly similar to the facts of this matter. Sergeant Monteleone, like the affiant in *Dibble*, explicitly testified that he did not use the term "controlled purchase" merely to get a search warrant and that he still considers the transaction that occurred between Jackson and Ms. Bell to be a drug buy. This case has even more indicia of a lack of bad faith on Sergeant Monteleone's part since he indicated the term "controlled purchase" is a standard term that is included in his unit's warrant affidavits. Accordingly, like the Supreme Court in *Dibble*, we should find that these facts reveal that the trial court engaged in a hypertechnical analysis and reverse its finding that the search warrant affidavit includes deliberate untruths. I would sustain the State's second assignment of error if I were to address its merits.

**{¶52}** Finally, I note that the trial court stated the following when announcing its decision to grant the motion to suppress:

> I find that had the affidavit been accurate, I think certainly from my perspective, I probably would have issued the search warrant. But, in light of the fact that we are required to give some deference to the magistrate making that determination, I would have denied a motion to suppress had the affidavit been accurate.

From this, it appears as though the trial court did not find any misconduct on the part of the police. Rather, it merely determined that the police were not thorough enough in producing the affidavit for the issuing judge. In light of this, I do not believe that the exclusionary rule was appropriately wielded. *See State v. Castagnola*, ___ Ohio St.3d ___, 2015-Ohio-1565, ¶ 97 ("Courts may apply the exclusionary rule only when its benefits outweigh the societal risks. * * * The exclusionary rule should not be applied when '"the official action was pursued in complete good faith"' because it would have no deterrent effect."), quoting *State v. George*, 45 Ohio St.3d 325, 331 (1989), quoting *United States v. Leon*, 468 U.S. 897, 919 (1984).

**{¶53}** In sum, I believe that we should sustain the State's third assignment of error and reverse the trial court's judgment. This resolution of the third assignment of error would render the remaining assignments of error moot so I would decline to address their merits. Because the majority reaches a different conclusion, I respectfully dissent.

APPEARANCES:

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellant.

JOSEPH P. MORSE, Attorney at Law, for Appellee.